Conant, Adm'r, *v.* Jackson et al.

JOHN A. CONANT, administrator of JOHN JACKSON *v.* EDWARD JACKSON, HIRAM WARNER and ABIGAIL WARNER, his wife, and HENRY STEBBINS and MARY ANN STEBBINS, his wife.

Where A. and B. each executed to the other a note for $2000, and placed the same in the hands of a third person, and the condition was, that, if B. did not drink more than three glasses of ardent spirit in a day, during his natural life, A's note was to be obligatory, but that, if B. did drink more than that amount, B's note was to be binding, and B. forfeited the condition, and his note was delivered by the holder to A., it was held that A. had no legal claim upon the note against B.

Although a person's mental faculties may be so far prostrated by long continued habits of intoxication, as to render him, for a considerable part of the time, incompetent to make a contract, yet contracts made by him at intervals when he *appears* sober and rational cannot be avoided on the ground of imbecility alone, unless they are so far unreasonable and unequal as to afford evidence that his *appearance* was deceptive, and his intellect, in reality, clouded and confused.

When a person attempts to invalidate a contract, on the ground that the person executing it was intoxicated at the time, the burden of proof is upon him to make out that fact,—the presumption of law being that the person was not in that situation.

A court of equity will not lend its aid to enforce a contract made by a man while in a state of intoxication; and, if not intoxicated at the time of making it, but his intellect have become stupefied by previous inebriation, the court will examine carefully the contract, to see whether any advantage has been taken of his condition.

It is not necessary that a party, seeking to impugn a contract for fraud or undue influence, should sustain his case by *direct* and *positive* testimony.

If the consideration of a contract, made by a person of feeble intellect, be so entirely inadequate as to afford evidence that he did not understand the nature of the contract he was making, relief against it will be afforded by a court of equity.

When one claims under a contract advantageous to himself, made by one imbecile in mind, or whose judgment has been enfeebled by habits of intoxication, and in whom the maker may reasonably be supposed, from their connection, or other circumstances, to have reposed great confidence, the burden of proof is on the claimant, to show that the person contracting understood what he was doing and intended to do what he did do.

In the absence of such proof, and of any evidence that the person contracting had ever expressed an intention to make such a contract, or had ever recognized it after it was made, the contract was held invalid in a court of equity.

APPEAL from the court of chancery.

The orator set forth in his bill that the intestate, John Jackson, died Aug. 24, 1837, leaving a widow with four children, and two children,—the defendants Abigail Warner and Mary Ann Stebbins,—by a former wife ; that his estate was represented insolvent, and commissioners, &c., appointed ; and that funds had not come into the hands of the orator, or under his control, sufficient to pay the claims outstanding against the intestate at the time of his decease ; that in 1828 the intestate was worth $60,000, and was then in partnership with the defendant, Edward Jackson, in trade, the intestate furnishing all the capital ; that in July, 1830, the partnership was dissolved and the partnership property purchased by Edward, who executed notes to John therefor, on which the orator claimed there was due, at the death of John, about $12,000 ; that, soon after the dissolution, John fell into habits of excessive intemperance, which he continued until the time of his death, and

that, in consequence, his mental faculties became gradually enfee-bled, until, about four years before his death, he became and continued wholly incapable of transacting any kind of business ; that, after the dissolution, John, by the procurement of Edward, was induced to deliver all his notes and valuable papers to Edward for safe keeping; and that their amount, including the notes due from Edward, was about $22,000 ; that, soon after ·the 19th of July, 1837, John went to parts unknown; and returned about three days before his death, having in his pocket book about $100 in money and some papers, which Edward carried away without the knowledge or consent of the intestate or his family,—returning the pocket book, without the money or papers, to the orator after the death of John; and that the orator had called upon Edward for an accounting for the property of John, which was in his hands as above stated, with which request Edward refused to comply.

The bill further set forth that Edward claimed that he had good title to hold said property by virtue of an assignment, executed to him by John on the 19th day of July, 1837, by the terms of which the said property was to be disposed of,—1, To repay to Edward $1000, which the assignment recited was paid by Edward to John that day ; 2, To pay to Edward a note for $2000, which Edward held against John, and had that day surrendered to him; 3, To pay the debts due from John to his creditors generally, excepting one of about $5000, which was secured by mortgage ; and, 4, To retain the residue ten years, if Edward should so choose, paying the interest yearly to the said Abigail and Mary Ann, children of John by his first wife, and, at the expiration of that time, to pay all, that should remain after deducting a reasonable compensation for his services, to the said Abigail and Mary Ann equally.

The orator charged that the said assignment was obtained by Edward fraudulently, and by taking advantage of his relationship and connection with the intestate, and his influence over him thereby acquired, and of the mental imbecility of the intestate, and that it was procured secretly, and for the purpose of defrauding the creditors of the intestate, and for the further purpose of giving John's children by his first wife a fraudulent preference in his estate, to the prejudice and exclusion of his other children ; and that the creditors of John did not assent to said assignment, but pre-

43

Conant, Adm'r, v. Jackson et al.

sented their claims for allowance by the commissioners upon the estate, and had them allowed.

The orator further charged that the $1000, for the payment of which to Edward the assignment first provided, was never paid by Edward to John; and that the note of $2000, then given up to John, and to be paid out of the funds assigned, was executed by John under such circumstances as to be utterly invalid.

The orator prayed that the said Edward might be ordered to deliver up the assignment to be cancelled, and that an account might be taken of the property of the intestate in his hands, and he be decreed to pay the same to the orator.

The defendant Edward Jackson, after admitting in his answer the partnership and dissolution as alledged, stated that, on a full settlement between him and John in July, 1830, after the purchase of the partnership effects by him, there was due to John from him $9082.98, of which $3000 was secured by mortgage, and for the balance he gave his notes, and he claimed that he had paid towards the balance, at different times between that time and the 19th of July, 1837, about $4000, besides paying the interest on the whole to July 10, 1836;—that during the years 1828 and 1829 John was dealing heavily in wool, and that, in consequence of his being thereby involved, Livermore & Dana, of Boston, attached all his visible property, together with the property of the firm of J. & E. Jackson; that the property of the firm remained for about a year in the custody of the officers of the law, during which time Edward was out of employment; that, at the time he purchased the partnership effects, he claimed an allowance for the injury he had sustained in consequence of the stoppage of his business, and that John then said to him, " give me your notes, and in the end I will do well by you, or right by you;" that, having lived on terms of great intimacy and friendship with John, he did give him his notes as above stated, believing that John would deal generously with him in relation thereto.

He further stated that he was accustomed to do the writing of John, and frequently went to his house for that purpose, John not being a ready accountant; and that he had bestowed much time and attention in the adjustment of numerous contested claims in favor of and against John, and that John always assured him, that,

Conant, Adm'r, *v.* Jackson et al.

on a final settlement of their accounts, he would deal generously with him for said services ; — that, at the dissolution of the partnership, a part of John's notes were left with him, Edward, for collection, and that, about the year 1835, John brought all his notes, as he said, to the store then occupied by Edward and his partner, Ketchum, for Edward to take charge of,—assigning as a reason for so doing, that he had missed a number of his notes, and believed his son Levi (his son by his second wife,) had taken them when he, said John, was absent; that the notes remained there, with some slight interval, until the 19th of July, 1837; and that during all that time Edward, his partner, and his clerks, were in the habit of assisting John, whenever he desired, in computing interest, making settlements, &c., and that he, Edward, being well acquainted with the circumstances of people in that vicinity, generally advised John, whenever he thought any of his debts were growing unsafe.

The defendant further stated that, at different times previous to the 19th of July, 1837, John had conversed with him in relation to the disposition of his property, and expressed an intention of giving a preference in his estate to his two children by his first wife,—saying that he had always lived happily with his first wife, and she had assisted him in making his property, and his children by her had been brought up at home economically, while his children by his second wife, as he said, had been brought up more expensively ;— that, some days previous to the 19th of July, 1837, John informed him that he had concluded what course to take in reference to his property ; and, in pursuance of instructions then given by John, the assignment, the provisions of which are above set forth, was drawn up ; and that it was carefully examined by John, and executed by him, July 19, 1837, in presence of B. Davenport and A. J. Ketchum ; —that it was executed freely and voluntarily by John, without any solicitation on the part of Edward ; and that John was then in no way under the influence of ardent spirit, but was in the full possession of his faculties. The notes assigned were all indorsed, and the mortgages were transferred by assignment on each.

The defendant further stated that he then paid John $200, and gave him a note for $302, and that these sums, with a just account he then had against John, amounted to $1685.21 ; which sum was balanced in part by a credit of $500, for a discharge in full of all

demands, " whether by bond, bill, note, book account, or other contract," in favor of John against him, which discharge John then executed and delivered to him, and by the provision in the assignment for the payment of the $1000 to Edward; and that John then gave up to Edward all the notes remaining of those executed by Edward to him on the dissolution of the partnership ; that the note for $2000, for the payment of which the assignment secondly provided, was executed by John, Feb. 2, 1835, at which time Edward gave to John a note of the same amount, which notes were then placed in the hands of a third person, under the condition, that, " if John did not drink more than three glasses a day during his natural life, Edward's note was to be obligatory, — but if he drank more than that number, then John's note was to be of force ;" that John forfeited the condition, and the note was delivered to Edward, and retained by him until the day the assignment was executed ; that Edward did not claim payment of it, but John proposed to put it into the assignment with an understanding, that, if he should draw on Edward afterwards, his drafts were to be accepted for the amount ; and, if he did not draw for it, Edward should use it for the benefit of John's children, as Edward might think was most for their good ;—and that it was so put in.

The defendant further alledged that the notes, which were then given up by John to Edward, were given up voluntarily, without any solicitation on the part of Edward, or any secret understanding in relation to them, and that it was intended on both sides as a full and complete discharge ,—the said John having repeatedly assured him that he would deal generously by him, and not exact the full amount of his notes, on account of the injury sustained by him from the interruption of his business, as above stated ;—and that he had never made any charge for his services rendered to John, but left it to John to do as he thought right.

The defendant further alledged, that, for some time previous, John had contemplated going to Montreal, and to Lockport, N. Y., where his daughter Abigail resided ; that Edward gave immediate notice to the debtors, against whom the claims assigned were outstanding, that the claims were assigned to him ; and that, soon after, he paid $1509.78 to the creditors of John ; that the pocket book mentioned was given by John to him, with a request that he

Conant, Adm'r, *v.* Jackson et al.

would take the money in it, and give him credit therefor; and that he did so, and returned the pocket book as he received it, except the money, to the orator after the death of John.

The defendant admitted that John was accustomed to drink ardent spirits, and that he at times drank to excess; but alledged that he was a man of strong constitution, accustomed to exercise much in the open air, and of a vigorous mind, and of sound judgment when not under the immediate influence of a large quantity of spirit. He also admitted that John had much confidence in him, but denied having any particular influence over him.

The other defendants answered generally, denying, in substance, any particular knowledge in reference to the material facts set forth in the orator's bill. Testimony was taken by the orator to sustain the allegations in his bill, and upon both sides, in particular, in reference to the said John's habits of inebriation, and the consequences to his mental faculties resulting from those habits, — the material parts of all which are detailed in the opinion of the court. It was admitted that the discharge, above specified, was in the hand writing of Edward.

After a hearing the case was referred to a master in chancery, for him to examine the accounts of the parties, who reported, that, on the 19th of July, 1837, John held notes against Edward, on which there was then due $6,893.96; that there was a balance on book then due from John to Edward of 1503.32; and that Edward should be allowed, in the whole, for the injury sustained by him in consequence of the interruption of his business, above set forth, and for the services rendered by him from time to time to John, with interest to that time, $1556.50,—leaving a general balance then due from Edward to John of $3834.14; that Edward had received on the claims assigned to him $3554.68, and had paid to John's creditors $1514.78, the balance of which, added to the balance above specified as due from Edward to John, with interest, made the sum of $7401.70; which the master reported was the amount due from Edward.

The court of chancery accepted the master's report, and decreed that the assignment and discharge executed by John, and delivered by him to Edward July 19, 1837, were utterly null and void; and the defendant Edward Jackson was enjoined from claiming any

thing by virtue of said discharge, and the other defendants were enjoined from claiming any thing by virtue of said assignment; and the said Edward was ordered to deliver to the orator, on request, all notes or evidences of debt which he received from John under said assignment, and to pay to the orator the said sum of $7401.70, with interest from the time the report was made, and costs.

*E. N. Briggs* and *R. Pierpoint* for orator.

The court of chancery will set aside a contract, when the party making it was, at the time, in such a state of mental imbecility as to render him incapable of exercising ordinary sagacity and judgment; and the circumstances were such as to render him peculiarly subject to the influence of the other party, and there is an inadequacy of consideration. *Clarkson* v. *Hanway et al.*, 2 P. Wms. 203. *Moth* v. *Atwood*, 5 Ves. 845. 6 Ves. 273. 8 Ib. 137. 9 Ib. 247. 10 Ib. 219, 292. 13 Ib. 103. 16 Ib. 512. 17 Ib. 20.

The court will also set aside a contract, when the party claiming under it stood, at the time of making it, in relation to the other party, as attorney, solicitor, trustee, or agent, or in any other fiduciary relation, by reason of which confidence was reposed in him by the other party, although it should not distinctly appear that the other party was at the time in a state of uncommon imbecility of mind, provided the contract was advantageous to the party claiming under it. 8 Ves. 348. 10 Ib. 393. 9 Ib. 247. 6 Ib. 266, 625. 18 Ib. 120. 13 Ib. 95. 5 Madd. 91. 4 Ib. 459. *Mott* v. *Harrington*, 12 Vt. 199.

The court will also set aside a contract, although there may be no evidence,—except what is derived from the transaction itself,—of imbecility of mind on the part of the person making it, or of the exercise of undue influence by the other party, when the contract itself is such as no man in his senses, and not under delusion, would make, and such as no honest and fair man would accept. *Chesterfield* v. *Jansen*, 2 Ves. 155.

It is contended that the release and assignment, set up by the defendants in this case, should be set aside; because

1. It appears from the evidence filed in the case that John Jackson, at the time of making the contract, was in such a state of mental imbecility and intellectual stupor as to be incapable of form-

Conant, Adm'r, *v.* Jackson et al.

ing a correct estimate of the nature and effect of the contract; and that this was well known to Edward Jackson at the time he procured the execution of the instruments.

2. That the defendant Edward Jackson, for whose benefit principally, and through whose sole agency, the contract was made, was at the time, and had been for years, the general confidential agent and counsellor of John, and that John reposed confidence in him, and was moved, directed, and controlled by his influence.

3. The release and assignment, and the whole transaction, as developed by the answer and the testimony, contain intrinsic evidence that they are such as no man, not under very strong delusion, would make, and such as no honest and fair man would accept or be party to.*

*C. Linsley* and *E. L. Ormsbee* for defendants.

This bill is not in reality for the benefit of creditors, but is a question between different sets of heirs. And no evidence appearing of fraud, importunity, deception, or mistake, and the evidence being full and uncontradicted that John Jackson, at the time of making the contract, was not intoxicated, the case must turn on his general legal capacity at that time.

Legal incapacity, arising from old age, sickness, intoxication, or from any other cause, is generally defined to be such a loss of mind and memory, as that the individual is not sensible of the consequences of his conduct. *Weakness* of mind or memory by no means disqualifies, for the law does not attempt to measure the force of men's minds; and hence, in the absence of fraud, contracts are binding on all who are *compos mentis.* There are no degrees of defect of understanding, save idiocy and lunacy. 1 Ch. Eq. Dig. 367, 667. *Hume* v. *Burton,* 1 Ridgw. 211. *Osmond* v. *Fitzroy,* 3 P. Wms. 130. *Bennet* v. *Vade,* 2 Atk. 327. 9 Mod. 312.

Intoxication, if habitual, may, and doubtless does, impair a man's faculties; but so does age; yet in either case the man is held capa-

---

*The counsel upon both sides went into a very extended and elaborate examination of the facts in the case bearing upon the points made by them, and especially in reference to the influence which the habits of John Jackson actually had upon his mind and judgment. But these are so fully discussed by the court, in the opinion given, that it is unnecessary to detail them here.

ble after a great loss of mental energy. *Wheeler et al.* v. *Alderson,* 5 Eccl. R. 218. But habitual intoxication, even of the grossest kind, was never holden to incapacitate a man, except for the time the influence of the exciting cause existed. *Ayney* v. *Hill,* 5 Eccl. R. 269.

In examining the evidence of want of capacity in a man of active habits, in good health, associating daily with many persons, left in the undisturbed control of his property, we naturally look to the particular acts of improvidence, folly, and want of reason that are set forth. The weakness and folly exhibited in his trades, we should expect, would be a prominent feature. The testimony filed by the orator is, in these important particulars, singularly defective. No attempt, even, is made to show that any bargain made by the intestate was ever avoided, or ever required to be avoided, by reason of his being overreached ; and no witness speaks of his capacity as a matter of knowledge and experience when sober, but as matter of *opinion* merely. While, on the part of the defendant, we have the testimony of twenty seven witnesses, all expressing an unqualified opinion that he was capable of doing business, when sober, and nearly all saying that he had by nature great bodily and mental vigor ;—and that his bodily health had not materially failed must be conceded.

The testimony is *full,* that, for some time before and after the assignment, he was settling and closing up his business ; and Capt. Farrington, in relation to this period, says, he might have drank something, but that he did not appear as though he had.

The effect of intoxication, in the avoiding of contracts, has undergone the most profound and elaborate examination by courts and legal writers, and many important points have been long and satisfactorily settled. Lord Coke laid down the rule, that a contract, entered into in a state of complete intoxication, could not be enforced ; and though that may now be treated as settled law, yet it made its way slowly, and was perseveringly resisted by the most eminent judges. While the law remained in this state, applications to chancery for relief against such contracts were not unfrequent ; but chancery received them with little favor, and refused to interfere, unless the contract was obtained by some wrongful act of the party seeking to enforce it. 1 Fonbl. Eq., B. 1, ch. 2. · *Johnson* v. *Medlicott,* 2 P.

Conant, Adm'r, *v.* Jackson et al.

Wms. 130 n. *(a.)* 1 Story's Eq. 234. *Cooke* v. *Clayworth,* 18 Ves. 12. *Say* v. *Barwick,* 1 Ves. & B. 195. *Clole* v. *Robin,* B. N. P. 172.

Judge Story, in his Equity Dig. p. 236, lays it down as still the rule in equity, that they will not interfere, even when the intoxication is complete, in order to set aside a contract, but will leave the parties to the law, unless some *fraud* or *imposition* is practised in procuring the contract. Is there, then, in this case, any evidence of any fraud on the part of the defendant, or of any persuasive procurement or device, which did or could operate on the mind of John Jackson? If any such facts are inferred, they must be inferred in defiance of the answer, and in the absence of all testimony to sustain them.

But it has been said that the assignment is unusual. We deny that the mere fact that this disposition of property is singular is any ground whatever, of itself, for setting it aside. Girard's will and the Smithsonian legacy are singular dispositions of property, and would little harmonize with what men in general would have done. The attempt to estimate the actual wishes of one man by the supposed wishes of another must, at least, be a vague and unsatisfactory mode of coming at the truth.

Again, it is said that it is unreasonable to suppose that John would have been willing to pay a note to Edward, that he could not legally have been forced to pay. But he had deliberately promised in writing that he would pay it; and the fact that he recognized that promise as binding in conscience cannot surely furnish a very violent presumption against his sanity, or his competency to do business. The answer of Edward is full to the point that no act of his induced this provision.

The opinion of the court was delivered by

WILLIAMS, Ch. J. The object of the bill appears to be to set aside a conveyance, or assignment, made by John Jackson to the defendant Edward Jackson on the 19th of July, 1837, and also a discharge executed by him, at the same time, to the defendant; and to call on the defendant to pay the sum due from him to the intestate at that time. It appears, from the report of the master, that there was due at that time from the said Edward, as allowed by the

44

master, $6893.96, from which the master deducted a balance due to the defendant on book, a claim for losses by an attachment made on the goods of the firm of John & Edward Jackson, and for the services of the defendant, rendered to John Jackson in his life time, $3059.82, leaving the defendant, at that time, indebted to John Jackson $3834.14, which was released by the discharge, if it is effectual.

By the assignment, and out of the avails thereof, the defendant was authorized to retain the sum of one thousand dollars, and also a further sum of two thousand dollars, for a note given up to John, which was executed under such circumstances that it constituted no legal claim against the maker. So that it appears that, at that time, there was, by the discharge and assignment, transferred and given up to Edward Jackson, by John, a sum but little short of seven thousand dollars. This, together with the circumstance that, by this transaction, the intestate parted with all his property, and that he was indebted to a large amount, and the creditors having presented their claims to the commissioners for allowance against his estate, required the administrator to investigate the business, and he has preferred this bill. We have been called on to examine the claims of the administrator and of the defendant, and determine, from the evidence, whether the administrator shall have this property for the benefit of the creditors and heirs of the intestate, or whether the defendant can, according to the principles of law, retain it. We are always to remember that a man may make any disposition of his property he thinks proper, after satisfying the claims of his creditors. As to them, we can compel him to be just. His generosity is to be measured by his own will and sense of propriety, and not by any rule of law which we can lay down.

It appears from the evidence, that, in January, 1829, the intestate had notes and obligations against several individuals, which were inventoried at $50,759, and he probably had real and personal estate besides of the value of twelve or fifteen thousand dollars. At this time the defendant was in partnership with him in a store, and the intestate held notes against the firm of over fourteen thousand dollars. In the spring of 1829 the goods of the intestate were attached at the suit of Livermore & Dana, and the goods belonging to the firm of John & Edward Jackson were also attached. In

Conant, Adm'r, *v.* Jackson et al.

July, 1830, their partnership was dissolved, and the defendant bought out all the interest which John Jackson had in the partnership property, for which he gave notes amounting to about $9082.98, besides paying $6000 in demands due to the company, part of which sum of $9082.98 was paid, and the residue constituted the indebtedness of the defendant to the intestate at the time the discharge and assignment were made. It further appears, that, within a few days after the date of the assignment and discharge, the intestate went away, stating that he was going to Upper Canada and Illinois, and returned the 24th of August, and died a few days thereafter.

Many witnesses have been examined on both sides to show the situation of the intestate during the last year and the previous years of his life; and, although there is not much difference in the relation given by them as to his habits, and his continued and excessive use of spirituous liquors, yet there is a difference of opinion as to its effect on his understanding. There is a very great similarity in the relation given by the witnesses as to the effect of his habits of intoxication, and his situation, at the time he executed the paper in question, to what we find in the few cases reported, where a similar attempt has been made to invalidate an instrument executed by such a man at such a time.

It is somewhat singular, but so it is, that there has always been a propensity to underrate the effects of intoxication on the mind and faculties of individuals, while all will agree as to its general tendency. The individual will always have credit for greater talents, higher powers of mind and intellect, and better qualities, than he in fact possesses. The contrast between the man when intoxicated and when sober is so great, that, in drawing the comparison, we are apt to give him credit for more than he would be entitled to, if there was less diversity in his habits and pursuits. There can be no doubt in my mind but that the habits of Mr. Jackson did undermine his physical and mental powers; that they produced, as is the usual effect of such habits, an incapacity to do business; rendered his neighbors and friends distrustful of his ability and capacity, and kept them watching, even in trivial matters, for a sober moment in which to transact business with him, and did induce them, as it did Mr. Keeler, who wished to make a settlement with him, to go early, before he got his bitters, and then to make a sacrifice

rather than not effect a settlement; — and it had also the effect to make him distrustful of his family; and hence that morbid feeling towards his wife and children, which such a man, in such a state, is too apt to indulge. It appears, that, so sensible was the intestate of this infirmity, he refused to attend to business, when indulging his appetite,—which, unfortunately, was too frequently the case,— and that he was obliged to prepare himself by abstinence, in order to endeavor to recall some glimmering traces of that energetic mind which had formerly distinguished him, before he would attempt to transact any important business.

It is sufficient to say,—without going minutely into the testimony,—that, from the evidence of Mr. Lyon, Mr. C. W. Conant, Mr. Field, Mr. Parkhurst, John Conant, Joseph Simonds, Gov. Jennison, Mr. Felton, Mr. Marsh, Mr. Briggs, Mr. Button, Mr. Sprague, Mr. June, and Mr. Starr, on the part of the complainant, as also from the testimony of the defendant's witnesses, it is apparent that, for a considerable time before his decease, and especially for the last six months or year of his life, he was, for a considerable part of the time, incapable of knowing the nature, effect, and consequences of a contract, and therefore unfit to transact business of any great importance; and that, finally, he was reduced to that state of bodily and mental imbecility, on his return just before his death, described by Mr. Clarke. But, during most of this period, there were times when he appeared so far sober that his contracts made at those times could not be avoided on the ground of intoxication and want of capacity merely, unless they were so grossly unequal and unreasonable as to afford evidence that the appearance was deceptive, and that the intellect was clouded, obscure, and confused.

The evidence tends to show that Mr. Jackson, at the time he executed the writings in question, was not in such a state of intoxication, as that his contracts would be void at law for want of capacity; the witnesses to the writings, Mr. Ketchum and Mr. Davenport, Mr. Bliss, who was in the store, and Mr. Hall, the magistrate before whom a discharge of a mortgage was acknowledged, say that at this time he was sober; and it is undoubtedly true, that a person, who seeks to invalidate an instrument on account of the intoxication and consequent want of capacity of the person executing it, takes upon himself the burden of proof, as the presumption is against a person's being in that state.

Conant, Adm'r, *v.* Jackson et al.

The principles, on which courts of equity, as well as courts of law, proceed in relation to the effect of intoxication in affecting contracts, have evidently undergone a considerable alteration.  In the time of Lord Coke a party could not set up intoxication in avoidance of his contract.  Afterwards it was considered, that it could not be set up, unless it was procured by the other party; but now it seems to be determined, that, if a person was so intoxicated as to be incapable of the exercise of his understanding, he may avoid a contract made while in that state.  Equity will not lend its aid to enforce a deed, or contract, obtained from a man when intoxicated; and, in relation to persons whose minds are prostrated by a course of intoxication, and who have become stupefied from previous inebriation, so as to be incapable of judging upon the propriety of what they do, a court of equity will make a strict examination, as to whether the instrument does not contain evidence that advantage was taken of those habits. 1 Ves. 43.

In the case of the *Earl of Chesterfield* v. *Jansen,* reported in Cooper, but more particularly in 2 Ves. 155, Lord Hardwicke enumerates the several species of fraud, against which a court of equity will relieve, and, under the second head, says, "it may be apparent, from the intrinsic nature and subject of the bargain itself, that it is such as no man in his senses, and not under a delusion, would make, on the one hand, and as no honest and fair man would accept, on the other."  Under the third head he says, " fraud may be *presumed* from the circumstances and condition of the parties contracting, and herein it is *different* from the rule of law, where it is to be *proved,* not presumed."

In the case of *Clarkson* v. *Hanway,* 2 P. Wms. 203, a conveyance, made by a weak man, easy to be imposed upon, was set aside, though there was no proof of any particular efforts made to prevail on him to execute it; but the deed was prepared by the grantee, and there was no proof that the grantor gave any instructions, or that it was read to him;—the master of the rolls observing, that the fraud was apparent, and judging upon the face of the deed is judging upon evidence which cannot err.  In the case of *Say* v. *Barwick,* 1 Ves. & B. 195, a lease was set aside, obtained from a young man, on coming of age, at a very inadequate rent, when he had been in habits of intoxication repeatedly and in com-

pany with the lessee. The testimony in that case was contradictory,—some of the witnesses saying he was so much affected by a former night's debauch, as to be utterly incapable of business, and others representing him as perfectly cool and collected, and aware of what he was about,—and the master of the rolls concluded he did know what he was doing. The lease had been previously prepared by the defendant, and executed in his house, and there was some evidence of the plaintiff's having confirmed it afterwards. In the case of *Dunnage* v. *White*, 1 Swanst. 138, the court refused to enforce a deed, it appearing on the face of it that the parties did not understand their rights, or the nature of the transaction, and that the heir surrendered an unimpeachable title without consideration, and evidence being given of his gross ignorance, habitual intoxication, liability to imposition, and want of professional advice, in the absence of proof of direct fraud, or undue influences, and after an acquiescence of five years.

From these cases it is apparent that no direct proof of fraud, or imposition, or undue influence, is required from a party endeavoring to set aside an instrument unduly obtained. It is true that it is the duty of a party, who seeks to impugn an instrument on that ground, to prove that such influence was exercised ; but it is equally true that positive and direct proof is not required. Influence is not susceptible of direct proof. Who can tell how, or in what manner, or how much, one man is influenced by the advice, conduct, or hints of another ? And when an advantage is obtained of another by the influence acquired over him, what proof or evidence of such influence could ever be afforded? If we should attempt to lay down any general rules upon the subject, and to determine before hand what acts or things should be evidence of influence, it would be easy to avoid the effect of them. In the case of direct fraud, the badges, which are laid down by Lord Coke in Twyne's Case, [3 Co. R. 80] in distinguishing a colorable and fraudulent sale from one *bona fide* are always foreseen, and care is taken that they should not attend a transaction intended to be fraudulent.

The court will not measure the degree of understanding, and say that a weak man may not contract, or give away his property ; yet they will scrutinize the gift, made by a man of a feeble understanding, or one whose powers of memory and whose mind and

Conant, Adm'r, *v.* Jackson et al.

judgment are gone, or impaired, from whatever cause it may have proceeded; and if made to one in whom confidence has been reposed, and no sufficient reason appears for the same, and the consideration be wholly inadequate, so as to afford evidence that the person did not understand the nature of the contract, or gift, he was making, relief against such a contract will be afforded in equity.

In the case before us I have already remarked that the mental faculties of the intestate were greatly impaired by his habits, that he had become jealous of his family, indulging in complaints about them, drawing comparisons between his wife and children and his former wife and children, that he reposed implicit confidence in the defendant, and that, by the writings executed at the time, he gave up to the defendant, or provided that he should receive property to the amount of nearly seven thousand dollars out of his notes then transferred, and those discharged to the defendant; for it appears that, after allowing all the claims which the defendant sets up in his answer, and we have no reason to believe but what the master made a liberal allowance for all the losses sustained by the defendant, and for all the services performed by him,—the defendant was then indebted to an amount of not far from four thousand dollars, and was to retain three thousand dollars out of the notes assigned.

It appears, further, that the discharge and assignment were made, or procured to be made, by the defendant, and no evidence is produced that they were read to, or by, the intestate; none of the family were consulted, or made acquainted with the transaction. No previous declaration of the intestate, that he contemplated making this extravagant gift, is shown. The only evidence that he ever intended it as a gift, or compensation, is contained in the testimony of a single witness, and he says that he contemplated not over one thousand dollars. The master has allowed him seven hundred and fifty dollars, and a further sum of four hundred dollars for his services. No receipt was given by the defendant, no counterpart of the assignment was executed, nor any obligation or writing, by which the defendant became bound to execute the trust, to which the representatives of the intestate, or his creditors, could resort for the purpose establishing their claims. The intestate left the coun-

try, and returned in the situation described by Mr. Clarke, and though his attending physician says he retained his senses until the last twenty four hours of his life, no mention is made by him of any provision made for his debts, or family. His pocket book, and what money he had, passed into the hands of the defendant during the last sickness. It is impossible to support this transaction, made without any apparent motive, and of which we should have supposed some written evidence would have been preserved by the intestate, or at least some mention of it made to some of his connections, if he retained any knowledge or remembrance of the nature and effect of the papers he signed on the 19th of July. And, if there was that great friendship and confidence reposed in the defendant by the intestate, in consequence of the fraternal regard he had for him, which has been so eloquently described by the able and learned counsel for the defendant, it would have been better reciprocated by the defendant in making a different provision for the family and creditors of his brother, and not in taking to himself so large a share of the remnant of the great property which John Jackson had formerly possessed.

The transaction carries on its face such intrinsic evidence of imbecility and undue influence, as to require a court of equity to set it aside. The very least which could be required of a person claiming such a gift, would be, that he should show that the person making it did in fact understand what he was doing,—that the papers were read to, or understood by him; and it is not sufficient for the defendant to rely on the presumption arising from the execution and delivery; but, standing in the situation that he does, the burden is on him, to show that it was understood by the intestate, and that he intended to do the very thing which it is claimed he has done.

Nor can the defendant say, that, by setting aside this assignment and discharge, he will be deprived of any thing which he has earned, or which is justly and equitably his due. Every legal claim has been awarded to him by the master, as well as a compensation for losses, and services, which were not presented to the intestate in his life time, and which were not noticed in the settlements made between them. It cannot be pretended, therefore, that there was any consideration for the discharge and assignment, so far as it gave to

Conant, Adm'r, *v.* Jackson et al.

the defendant the amount due from him to the intestate, and the three thousand dollars which he was to have out of the notes assigned.

If the object had been merely to provide for the payment of his debts, and to make a provision for the children of his first wife, no one could with propriety have objected to it. Whether they will be benefited or injured by setting aside the gift to the defendant cannot be determined, until there are further proceedings had in the settlement of the estate; nor could it affect our view of the case, whether they would be benefited or not. By that assignment they were left entirely to the good feelings and sense of justice of the defendant, as no obligation was taken from him to enforce the performance of the trust. The defendant appeared as the sole owner of the notes therein described, gave notice to the debtors that they were assigned to him, and neither the creditors, nor legal representatives, nor heirs, had any evidence left to secure the due performance of the trust. If the intestate intended to make provision for them, as claimed by the defendant in his answer, he did not discover much of that shrewdness and capacity which has been attributed to him, when he took no security whatever to enforce the performance of the trust, but managed the business in so inartificial a manner that he left the whole dependent upon the continued good feeling and generous disposition of the defendant; and when, in the event of the decease of this defendant, as well as of John Jackson, nothing would have appeared, but what the whole property assigned belonged to the defendant. The notes assigned would not have left a large fund for those children, after paying the debts of the intestate, and the three thousand dollars to be retained by the defendant.

If the intestate had made a will, at the time he made this assignment, and made the same provision which the defendant now claims, and there had been the same evidence, which we now have, of his imbecility, and his habits, and of the situation of the defendant, and the same want of any evidence of his having declared it to be his intention to do that which he has done, it could not have been deemed valid. But a greater security would have been had in that case, than is afforded by the present transaction. A will is revocable during the life of the testator;—this discharge and assignment were executed and irrevocable. A will is declared and

Conant, Adm'r, *v.* Jackson et al.

pronounced to be the will of the testator in the presence of witnesses.  The person who writes the same can tell the situation and the intention of the testator,—or, if the testator writes it himself, it may carry in itself evidence of design.  This discharge and assignment were prepared by the defendant, signed by the intestate, and the witnesses know only of his signature, but do not know that he ever read or understood the contents of the papers he signed.  A will is retained in the possession of the testator, and may be cancelled or destroyed.  This assignment and discharge were executed and delivered to the defendant.  What became of the notes, which the intestate held against the defendant at that time, is not in evidence.  In a will we have evidence that the testator intended a gift.  That evidence is wanting in this case.

On a careful review of the testimony we cannot think the discharge and assignment should be permitted to remain as evidence of the legal act and intent of the intestate.  As a contract it has no consideration to support it.  As a gift,—taking into consideration the situation of the intestate, the sickly and unnatural state of his feelings towards his family, produced entirely by his habits, the influence which the defendant must have had over such a man at such a time, arising from their former intercourse, and considering also the extravagant amount of the sum given, without any evidence of any previous intention so to do, and with no other evidence of its being understood by the intestate than what is afforded by the testimony, — it cannot and it ought not to be sanctioned in a court of equity.

The decision of the chancellor is affirmed in every particular; and the case will be remanded to the chancellor, with directions to execute the same, and to issue execution for the amount ordered to be paid by the former decree, with interest, and with additional cost, if not paid within ten days from that time.