# KATHERINE JORDAN PEAVEY v. FREDERICK B. WELLS AND OTHERS.[1]

### January 11, 1918.

### No. 20,602.

**Corporation — sale of stock by shareholders.**

1. Plaintiff's testate sold to two of defendants certain stock in a corporation in which all were actively engaged, taking in payment a note secured by the stock as collateral, payable only out of dividends on the stock.

**Same — action to set aside transfer — constructive fraud.**

2. This action is brought to set aside the transfer, not on the ground of misrepresentation or deceit, but of constructive fraud. The principle of law invoked is, that he who bargains in a matter of advantage with a person placing confidence in him, cannot be permitted to get the better of the bargain.

**Same — principle inapplicable.**

3. The facts do not bring the case within that principle. Deceased acted understandingly and with free volition. His acts bound him.

**Same — no presumption of fraud.**

4. The nature of the consideration, under the circumstances of the case, raises no presumption of fraud.

**Same — action without legal counsel.**

5. Failure to secure independent legal advice is not, in itself, ground for avoiding the transaction.

**Same — validity not affected by creation of trust.**

6. The fact that the transaction also involved the creation of a trust making defendants trustees and deceased a beneficiary, does not affect the validity of the transfer of stock.

[1] Reported in 165 N. W. 1063.

After the former appeal reported in 136 Minn. 180, 161 N. W. 508, defendant's motion to strike out the conclusions of law and substitute others was granted, Jelley, J. From the decree entered pursuant to the substituted conclusions of law, plaintiff appealed. Affirmed.

*Davis, Severance & Olds* and *Richard Reid Rogers,* for appellant.

*Lancaster, Simpson & Purdy,* for respondents.

HALLAM, J.

1. Plaintiff brings this action to set aside a transfer of 7,000 shares of the capital stock of F. H. Peavey & Company, made in 1907, by George W. Peavey, deceased, to the defendants Heffelfinger and Wells. The stock was transferred at its face value, defendants giving their demand note at 4 per cent interest for the amount, secured by the stock as collateral, subject, however, to the condition that the note and interest are not required to be paid otherwise than from the proceeds of dividends upon the stock. On the trial the district court set the transfer aside on the ground that it was without consideration. This decision was reversed, for the reason that the transfer was an executed one and required no consideration to sustain it. 136 Minn. 180, 161 N. W. 508. The district court then gave judgment for defendants on findings that there was no fraud. Plaintiff appeals and contends that fraud was established and that findings to the contrary are not sustained by the evidence.

To understand the transaction we must take into account some matters of family history. The business of F. H. Peavey & Company was a grain and elevator business in Minneapolis established by Frank H. Peavey. Mr. Peavey had three children. George, plaintiff's husband, was his only son. One daughter married defendant Heffelfinger; the other, defendant Wells. In 1899 Peavey conceived the idea of taking his son and sons-in-law into the business with him by sale to each of a 1-36 interest, taking a note therefor payable out of the earnings of such share.

Seven months later Peavey made his will, and into that he carried this same idea of sale of an interest in the business to be paid for by so-called "dividend notes." In this will he requested that upon his death the surviving partners, that is, his son and sons-in-law, continue the business of the firm for 5 years, and he directed that at the expiration of 5 years a corporation be formed to take over the business and that the executors

sell to his son and to his sons-in-law each ⅓ of the capital stock of the corporation, taking in payment a note bearing interest at 4 per cent, secured by the stock as collateral, and payable out of the dividends declared and paid on the stock. He further directed that said notes not to exceed $800,000 be transferred to each of his three children. The above mentioned directions were carried out. Peavey died December 30, 1901. The corporation was organized December 31, 1906. George W. Peavey, Heffelfinger and Wells each subscribed for one million dollars worth of stock, giving notes payable as above described and notes were distributed according to the will. The practical result was that Heffelfinger's note for $800,000 was transferred to his wife, Wells' note for like amount to his wife and George Peavey's note for like amount was returned to him and canceled, thus giving him this much stock clear of debt. It is part of this stock that is in controversy.

When the corporation was formed George W. Peavey became president, Heffelfinger and Wells vice presidents. The business was transacted largely through a number of subsidiary corporations. The executive offices in these were about equally divided. George Peavey was also a director in the Northwestern National Bank.

Heffelfinger was then 37, Wells 33 and George 29. All had been partners in the business for more than seven years. Each was drawing a salary of $20,000 a year. Peavey did not devote himself as assiduously to business as did Heffelfinger and Wells. He was addicted to the use of liquor but never drank to such an extent as to incapacitate him for business. "It never seemed to have a hold on him" and "to an outsider it was scarcely perceptible." In the summer of 1907 he decided to quit active business life. In September he became infatuated with a profligate woman, left his wife and went to New York, intending to sail with this woman for South America for an indefinite time. Heffelfinger and Wells became naturally alarmed. The corporation was a large borrower, notes of the corporation for hundreds of thousands of dollars were outstanding indorsed by Peavey, Heffelfinger and Wells. Heffelfinger was in Boston, Wells wired him and he went to New York.

An uncle, Peavey's father's brother, who lived in New York, was called in and both he and Heffelfinger tried to dissuade Peavey from his purpose. To his uncle, George said he was going "to leave Minneapolis" and

was "through with the grain business." These parties were together in New York from September 15 to September 19, when the transfer of the stock was made. George also resigned as executor of his father's will, and as administrator of his mother's estate, as officer and director of F. H. Peavey & Company and of 14 subsidiary companies, and transferred his property to Heffelfinger, Wells and the Minneapolis Trust Company as trustees with power to manage and control the same and with authority to pay to his wife, for her support and maintenance, not less than $10,000 and not more than $20,000 per annum and to pay the balance to himself.

The issue is narrow. There is no claim of any misrepresentation or deceit. Plaintiff relies on what is called "constructive fraud." The principle of law on which plaintiff relies is, that he who bargains, in a matter of advantage with a person placing trust and confidence in him, is bound to show that a reasonable use has been made of that trust and confidence. Whelan v. Whelan, 3 Cowen, 537; King v. Remington, 36 Minn. 15, 29 N. W. 352; Fischer v. Sperl, 94 Minn. 421, 103 N. W. 502; Shevlin v. Shevlin, 96 Minn. 398, 105 N. W. 257. A multitude of decisions might be cited which restate the rule in varying language. The principle is just and right. Originating in cases involving the conventional relation of trustee and cestui que trust, it has been broadened and extended to every variety of relation in which dominion may be exercised by one person over another (Huguenin v. Baseley, 14 Ves. Jr. 273), and when such a relation does exist, courts of equity will not suffer one party, standing in a situation of which he can avail himself against the other, to get the better of the bargain. 1 Story, Eq. (12th ed.) § 307.

3. The question is, do the facts make a case for the application of this principle? The trial judge found they did not. He found in effect that there was no relation of trust and confidence between Peavey and Heffelfinger and Wells. Had this transaction been consummated while Peavey was at his desk or at his home in Minneapolis, anything like a trust relation existing between these parties would probably not have been claimed. Misplaced confidence or personal domination as of an "elder brother" would probably not have been thought of. We find nothing in the record to suggest that any such relation existed between these parties in any of their prior dealings. He was their equal in business position,

had had "great experience in business for one of his age," and was accustomed to rely on his own judgment.

It is undoubtedly true that at the time of the meeting in New York George Peavey had suffered a tremendous moral lapse. In spite of that, there is no evidence of mental incapacity or that he was anything but self-reliant. He might have consulted his uncle, whom he doubtless trusted, but he simply told him what he had decided. He was not under the influence of liquor nor suffering from its use. The same day he signed the papers he "cut off" all relations with his paramour and asked Heffelfinger to plead for his wife's forgiveness. Three days later he sailed for Europe alone. As soon as he took passage he commenced writing letters to his wife begging her to rejoin him. She did so. Before she did so, however, Heffelfinger and Wells explained to her the transaction, and advised her they were so vitally interested in the matter that she had better consult a disinterested lawyer. She did get the advice of a high class lawyer and told her husband so. After she joined him they spent nearly three years abroad. To the day of his death Peavey remained faithful and lived a sober life. In October, 1910, after the return from abroad, the trust agreement above mentioned was revoked. An agreement was made, signed by Peavey, Heffelfinger and Wells, reciting the sale of the stock and the giving of the note, stipulating that the note be delivered to Peavey and that all payments be made to Peavey direct, or on his order, and that the stock be held by defendant Deaver for the purpose specified in the note. Here was a direct reaffirmance of the New York agreement. Peavey lived two and a half years longer. He at all times understood the nature of the transfer. He never hinted dissatisfaction. He acted throughout with understanding and with free volition. His acts bound him. Shevlin v. Shevlin, 96 Minn. 398, 105 N. W. 257; Ludington v. Patton, 111 Wis. 208, 86 N. W. 571, were very different cases.

4. It is urged that the consideration is so inadequate as to raise a presumption of fraud. Want of consideration may be decisive evidence of fraud where there is great inequality between the contracting parties or a relation of trust and confidence between them. Conant v. Jackson, 16 Vt. 335; Stone v. Moody, 41 Wash. 680, 84 Pac. 617, 85 Pac. 346, 5 L. R. A. (N. S.) 799; Casborne v. Barsham, 2 Beav. 76; Heathcote v.

Paignon, 2 Brown's Ch. 167. In itself, it does not establish fraud "unless it is so gross as to shock the conscience of any man, who heard the terms." Lord Eldon in Gibson v. Jeyes, 6 Ves. Jr. 267, 273. The nature of the alleged consideration in this case was discussed somewhat on the former appeal. 136 Minn. 180, 187, 161 N. W. 508. Whatever may be said of its sufficiency as constituting consideration in point of law, when we take all the facts into account the transaction was not a strange one. The will of Frank H. Peavey contained this significant provision, that, upon the formation of the corporation, "if my son or either of my sons-in-law do not wish to or is incapacitated from making" purchase of his third of the stock of the corporation, "said stock shall be sold to the other two, one-half to each, upon the same terms." That is, George Peavey, in New York, left himself in the same position as he would have been in had he not wished, or not been able, to enter the corporation in the first place.

When he had once availed himself of the right to purchase this stock, he, of course, had all the legal rights which that purchase gave. Yet it probably seemed clear to all of them that it was the desire of Frank H. Peavey that his son and sons-in-law should continue in the business and that this option to them to purchase stock was in furtherance of that desire, that he assumed that if they availed themselves of the option they would identify themselves with the business, and that it was with these things in mind that he gave to his son this option, which he did not give to his daughters. Accordingly, when George Peavey decided to abandon the business to Heffelfinger and Wells, it is not shocking that he should transfer to them the right to acquire this stock in the same manner. This left him in the same position as his sisters, and in the position in which his father planned that he should be if he saw fit not to enter the corporation in the first instance.

5. Much is made of the fact that George W. Peavey had the benefit of no independent legal advice. He had ample opportunity to secure counsel but showed no desire to do so. In the absence of some relation of trust or confidence, this is not of great importance if he understood the legal effect of the transaction. Zimmerman v. Frushour, 108 Md. 115, 69 Atl. 796, 16 L.R.A.(N.S.) 1087, 15 Ann. Cas. 1128. The court found that he did. It seems unlikely that he failed to understand fully.

6. The fact that Peavey signed the trust agreement with the other papers several days before Heffelfinger and Wells signed on their part, does not make the transaction one between trustees and beneficiaries. There was but one transaction. No relations were established until the documents were executed on both sides.

We conclude that the sale of the stock was valid.

Judgment affirmed.