[No. 5943. Decided February 26, 1906.]

IREDELL S. STONE et al., Appellants, v. H. L. MOODY et al.,
Respondents.[1]

VENDOR AND PURCHASER—FRAUD—RESCISSION BY VENDORS—EVI-
DENCE OF FRAUD—SUFFICIENCY. The plaintiffs, people of average
business ability, agreed to sell to the defendant, a total stranger to
them, who dissuaded them from consulting an attorney, 3,840 acres
of land for the sum of $25,000 upon a small cash payment to begin
with, and $2,500 annually thereafter. The contract was upon a
printed form and contained a provision authorizing the defendant
to sell any portion of the property, not less than one-half section at
a time, making contracts direct, which the plaintiffs agreed to accept
as cash payments on the contract of sale. The plaintiffs testified
that they refused to agree to any such proposition, and did not know
that it was contained in the contract, the defendant having con-
ceded their demands. The contract was drawn up by the defendant
and read over to the plaintiffs by him, omitting the said clause,

1Reported in 84 Pac. 617.

which was part of the printed matter. Subsequently the defendant made a contract of sale of 2,500 acres for $22,500, and demanded that it be accepted as cash. This the plaintiffs at first refused to do, but later, after protests and upon representations by the defendant that it would not in any way release him from making payments as long as they held title to the lands, the plaintiffs indorsed upon the contract a receipt for $22,500, releasing the balance of the land therefrom. *Held*, that the plaintiffs had been overreached by the fraudulent practices of the defendant and a judgment of nonsuit should be reversed and a new trial ordered.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered July 27, 1905, upon findings in favor of the defendants, after a trial before the court without a jury, dismissing on the merits an action to rescind a contract for the sale of land. Reversed.

*T. P. & C. C. Gose,* for appellants.

*W. H. Winfree* and *F. L. Taylor,* for respondents.

Root, J.—Appellants owned about three thousand eight hundred and forty acres of land, in Klickitat county, upon which they lived. Respondent H. L. Moody, who up to the time in question had been unknown to the appellants, called upon them with reference to making a purchase of said land. After examining the land, and spending two or three days with them, a written contract was entered into, wherein and whereby Moody agreed to pay appellants $25,000 for the land, and in lieu of interest, agreed to pay $600 additional. The terms of the payment were as follows: $100 cash, $400 February 1904, $1,000 March 10, 1904, $600 February 1, 1905, and $2,500 on the 1st day of each and every February thereafter until paid, with permission to pay the whole at any time. The contract provided that Moody should have the right to sell any part of the property, not less than one-half section at a time, whenever he desired; and it was further provided that appellants should not take any deficiency judgment, nor require any insurance, and that they would allow second party to assign

the agreement if he desired.   The written contract also contained the following:

"He [Moody] may draw the contract direct from the first parties hereto to such purchasers, or from himself, and the first parties agree to accept such contracts as cash payments on this contract, when either drawn to themselves or properly assigned to them, without recourse, by the second party hereto, or his assigns."

The foregoing contract was entered into on the 1st of February, 1904.   Moody paid, at the time of entering into the contract, $100, and on February 9 made a further payment of $400.   On the 26th of February, 1904, Moody sold to one Fred W. Heller two thousand five hundred and sixty acres of said land, upon a contract wherein and whereby said Heller agreed to pay $22,500.   Thereafter said Moody presented said Heller contract to appellants, and demanded that they give him credit for $22,500 upon his contract with them, and after considerable controversy over the matter, appellants signed upon the back of the contract the following indorsement and receipt:

"February 27, 1904.

"Received $22,500 on the payments mentioned within, to be paid after February 1st, 1905, leaving $2,500 now unpaid, sections 33, 29, 9, the south half of the northeast quarter, the south half of the northwest quarter, and the south half of section 21—within mentioned, are hereby released from this agreement;"

which receipt was signed by all of appellants.   On the 9th of March, 1904, respondents paid to appellants the further sum of $1,000 on account of the purchase price.   On the 9th day of April, 1904, respondents tendered appellants the further sum of $1,600, on account of said contract, and as full and complete payment of the purchase price, and demanded of appellants a good and sufficient deed to all of the remaining lands.   Appellants refused to accept said money or to make said deed.   They soon after instituted this action to set aside the contract made with respondent Moody.

They claim that said Moody was guilty of fraud, misrepresentation, and overreaching, and that they signed the contract and the receipt hereinbefore mentioned under a mistake and misapprehension as to the contents and effect of the contract, and as to the significance and effect of the receipt. They claim that, when Moody was negotiating with them for the purchase of the property, they expressed a desire to consult an attorney and obtain legal advice, but that he dissuaded them by representing that he was a man thoroughly familiar with such transactions, accustomed to drawing contracts of sale, and that he was an honest and upright Christian man, and would protect their interests fully in every respect; that he was in a hurry to get away, and delay would occasion him great inconvenience, and that there was no need of the delay or expense attendant upon going to town to consult attorneys; that he manifested every appearance of being fair, upright, and honorable, and won their confidence and trust.

Appellants strenuously contend that the clause of the contract hereinbefore quoted, which refers to the acceptance of contracts as cash, was put into the contract without their knowledge and consent, and against their wishes, and that they did not know of its presence in the contract until long after its execution. In preparing the contract, a printed blank was used, covering the usual and ordinary conditions found in contracts for the sale of land, and containing spaces wherein could be written any special matters of agreement between the parties. In discussing these latter, Moody suggested the proposition of his being permitted to sell portions of the land, and to turn the contracts thus received over to appellants as cash. Appellants say, that they emphatically refused to accede to this proposition, and that Moody said that he would, therefore, not place the same in the contract; that they signed the contract without reading the same, having heard Moody read it.

After the latter had made the contract of sale with and

to Heller, and presented the contract to appellants, and demanded from them an acceptance of the same as cash, and a receipt showing that it was so accepted, appellants at first declined and refused to comply with these demands, and one or two stormy interviews took place between them. They claim, however, that Moody represented to them that the receipt did not mean what they thought it did, and that by signing it they would not release the property from the effect of their contract, and that it would not in any way release him from making complete payment, or in any way release the property from the lien which they would have, inasmuch as the title still remained in their name, and that he would see that they were in no manner imposed upon, but should have and receive the money for which they had agreed to sell the property; and that, being misled by his statements, suavity, and misrepresentations, they signed said receipt. They claim that they did not understand the purport or significance of said contract or of said receipt in any different way from that in which he orally explained and interpreted it to them, until Moody tendered them the $1,600 and demanded a deed for the balance of the property. The claims made by appellants, as hereinbefore set forth, are substantiated by the evidence they adduced at the trial.

The lower court rendered judgment in favor of respondents, upon their motion for nonsuit at the close of appellants' case; having, however, after the making of the motion, permitted the respondents to introduce evidence as to the value and present ownership of the property, and as to tender of payment and refusal. The court found that appellants were people of, or above, average intelligence, and found that Moody was an utter stranger to them prior to the commencement of the negotiations with regard to the purchase of the land; that they knew, or had opportunity to know, of all that was in the contract, and of all that was in the receipt, and that there was no fraud or misrepresentation or overreaching, and that appellants were not in a position to be

heard to say that they did not know what they were signing.

We reach a different conclusion from that of the trial court, but are able to do so, we admit, with considerable difficulty. Ordinarily, when people of average intelligence sign instruments which they have an opportunity to read, but do not, they should not be afterwards permitted to say that they did not know what they were signing. If this contract did not contain a provision which we deem to be absolutely unconscionable, and one which no intelligent vendor would knowingly have subscribed to, we would not be disposed to listen to any claim on the part of these appellants that they did not know of the contents of this contract. Why intelligent people, unfamiliar with business matters and the forms, terms, and requisites of written contracts, should enter into one of this magnitude without legal advice, and do so relying solely upon the representations of the opposite party to said contract, is hard to understand; and why these appellants should have signed the receipt hereinbefore mentioned is still more difficult of comprehension. These things evidence a stupidity most pronounced.

When we turn to the other party to the contract, however, we see evidences of something worse than stupidity. The provision in this contract which permitted Moody to sell any portion of this land (not less than three hundred and twenty acres at a time) upon a contract for any amount which he might choose above a certain price, and to have the privilege of turning over such a contract as cash to appellants, afforded an opportunity for the rankest kind of fraud. To perpetrate the fraud, all that would be necessary would be to make out a contract, in form, to a "straw" man, or to an absolutely irresponsible person, for a small portion of the property, and then receive for this valueless thing a credit upon his contract with appellants for whatever amount might be mentioned as the consideration in the sham contract.

Eliminating from the case the evidence of appellants that

they did not know that this clause was in the contract, we
think the presence of such a clause, without some clear and
strong reason in behalf of appellants for its being there,
would of itself be sufficient to overcome the claim of Moody
that appellants knew of its presence in the contract. In
cases of this character, to set aside a written instrument
where the issue is as to whether the parties knew of certain
things being in the contract, the question is usually one of
veracity between the respective parties; and where it is evi-
dent that the parties sought to be charged might have known,
by the exercise of their natural faculties, of what the instru-
ment contained, the law will not permit them to say that they
did not know, but lets the instrument speak for itself and
be controlling. But where such an extraordinary provision
as we have here is found in a contract—one which, as a mat-
ter of law, renders the contract obnoxious to every sense of
fairness, honesty and right, and is such as to make its en-
forcement clearly unconscionable—the court is justified in
believing that the parties sought to be charged did not know
of the presence of such provision, or did not have any com-
prehension of its significance.

Where it is to the court perfectly plain that one party has
overreached the other, and has gained an unjust and unde-
served advantage which it would be inequitable and un-
righteous to permit him to enforce, we do not believe that
a court of equity should hesitate to interfere, even though
the victimized parties owe their predicament largely to their
own stupidity and carelessness. It is well known that many
good people, and people of average or greater intelligence,
are sometimes duped and misled by the skill, cleverness, and
artifices of those who are adepts in the matter of deceiving
their fellow men; and courts should not throw about schemers
of this kind a protection that will tend to encourage the prac-
tice of their arts. Such people should not find encourage-
ment in the thought that, by keeping their machinations
within the letter of the law, they may find sanction for their

practices and reap the reward of their craftiness. To the victim it is of little import whether his property is taken from him by a bold and forcible robbery, or by an ingenious and unsuspected deception. The injury to him is the same; and the evil effect of court decisions which permit the wrongdoer to enjoy the fruits of his chicanery is of no small import when viewed from the standpoint of public policy. It is not the function of courts to make contracts for parties, or to relieve them from the effects of bad bargains. But where the simplicity and credulity of people are taken advantage of by the shrewdness, overreaching and misrepresentation of those with whom they are dealing, and they are thereby induced to do unwittingly something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, we think a court of equity may with propriety interpose.

The judgment of the lower court is reversed, and the cause is remanded with instructions to grant the relief prayed for in appellants' complaint.

MOUNT, C. J., DUNBAR, CROW, and FULLERTON, JJ., concur.

ON PETITION FOR REHEARING.[1]
[Decided May 25, 1906.]

PER CURIAM.—After additional written argument and further consideration, we have reached the conclusion that this case should be, and it is hereby, remanded for a new trial. Either party may have the privilege of using the evidence before the court on the former trial in so far as the same is available and desired, and may introduce such further evidence as seems advisable.