## BARKER *et al.* v. WISEMAN *et al.*

No. 5170.   Opinion Filed September 21, 1915.

Rehearing Denied October 12, 1915.

(151 Pac. 1047.)

1.    DEEDS—Inadequacy of Consideration—Fraud. Ordinarily mere inadequacy of consideration is not sufficient ground, in itself, to justify a court in canceling a deed, yet when the inadequacy is so gross as to amount to fraud, or in the absence of other circumstances to shock the conscience, and furnish satisfactory and decisive evidence of fraud, it will be sufficient ground for canceling a conveyance or contract, either executed or executory; the rule being based upon the theory that fraud, and not inadequacy of price, is the sole reason for the interposition of equity.

2.    SAME. Whenever it appears that the parties to a trade have knowingly and deliberately fixed upon any price, however great, or however small, there is no occasion nor reason for interference by courts, for owners have a right to sell property for what they please; but where there is no evidence of such knowledge, intention, or deliberation by the parties, the disproportion between the value of the subject-matter and the price may be so great as to warrant the court in inferring therefrom the fact of fraud.

3.    **ATTORNEY AND CLIENT—Contracts—Construction.** Where a contract is entered into between a lawyer and another person, and the latter looks to and depends upon the former for counsel and advice, especially where such other person is extremely ignorant, and practically of no business experience, and a disagreement arises as to the terms and conditions of such contract, every presumption should be against the lawyer, and if it appears that the contract is ambiguous and uncertain, that construction should be given it which tends most strongly against the lawyer.

(Syllabus by Robberts, C.)

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Action by W. M. Wiseman and another against O. S. Barker and Polly and Jackson Simons, Barker having occupied the land in controversy as a tenant of Polly Simons. Judgment for plaintiffs, and defendants bring error. Reversed and remanded.

*J. A. Baker,* for plaintiffs in error.

*A. M. Fowler,* for defendants in error.

Opinion by ROBBERTS, C. This case comes here on appeal from the district court of Seminole county. The case was originally commenced on the 20th day of November, 1909, by the defendants in error, Wm. Wiseman and James H. Cobb, as an ordinary action in ejectment to recover the west half of the southeast quarter and the southeast quarter of the southeast quarter of section 24, township 9, range 7 east, in said county. To the original petition the defendants, who are plaintiffs in error herein, filed a general denial. It appears from the record that, after the issues were thus joined, the defendants in error obtained possession of the premises. Thereafter the plaintiffs in error amended their answer by filing a cross-petition which in effect amounted to a petition in ejectment, alleging, in substance, that the defendant Polly Simon

was the owner and entitled to the immediate possession of said premises, and that said plaintiffs, who are defendants in error herein, had evicted defendants and were wrongfully keeping them out of possession thereof, whereby they were damaged in the sum of $250.

The plaintiffs in error Polly Simon and Jackson Simon are husband and wife. Plaintiffs in error further allege in their cross-petition that said land was originally allotted to Pilot Island, a minor Seminole freedman, and that he died at about the age of 15 years, intestate, and without issue, leaving Polly Simon, plaintiff in error, who was his mother by a former husband, his sole heir at law and thereby the owner in fee simple of said land.

It further appears from the record that Polly and Jackson Simon were ignorant, uneducated freedmen, and that prior to the death of her son, Pilot, they had resided on said premises for a number of years; that they were very poor, and upon the death of Pilot, being unable to buy a coffin and provide for other funeral expenses, they went to one J. E. Foreman, of Wewoka, for the purpose of obtaining means to pay said expenses. For the purpose of obtaining these funds from Foreman, the plaintiffs in error allege that they proposed to execute and believed that they were executing to him a lease on these premises, but learned afterwards that, instead of being a lease, the instrument which they then executed was a deed to these lands; that they were unable to read and write; and that said deed was obtained from them by fraud and misrepresentation and under the belief that the same was a lease given as security for the money borrowed; that the deed was for 80 acres of the tract involved herein. It also appears that, prior to the time of executing the deed

to Foreman, Polly Simon had made what was known and referred to in the record as an improvement lease, to T. S. Cobb and Wm. Wiseman on this same land; Wm. Wiseman being the same Wiseman who is one of the parties hereto. After Wiseman and T. S. Cobb learned of the conveyance by Polly Simon to Foreman, they refused to make the improvements required under their contract because of said deed to Foreman, and stated to Polly that if she and her husband, Jackson Simon, would execute a deed to them to said premises, they would have the deed to Foreman canceled of record, and pay Polly Simon the sum of $15, and further that, when she obtained her patent for said land, they would buy the land and pay her the value of the same. The plaintiffs in error further allege and admit that Polly Simon executed said deed, but the same was not executed and delivered for the purpose of conveying the premises to the grantees therein, but simply to enable T. S. Cobb and Wiseman to secure the cancellation of the deed to Foreman. They further allege that they have received no other or further consideration for said premises, and that said plaintiffs, defendants in error, wrongfully took possession of said land and evicted them from said premises, and claimed to be the owners thereof, and that they still wrongfully keep possession of said land; that there is about 28 acres of said premises in cultivation; and that they have been damaged by the defendants in the sum of $250.

The defendants in error, for their reply to the cross-petition, deny each and every allegation therein contained.

Upon the trial of the case, the following stipulation was entered into by and between the parties, to wit:

"It is agreed by and between the parties hereto that the land in controversy was allotted to Pilot Island, a

minor Seminole freedman, the child of the defendant
Polly Simon; that said Pilot Island died in the year 1906,
before receiving his patent, intestate, and without issue;
that Polly Simon, his mother, is a Seminole freedman,
enrolled and allotted as such; and that the said Polly
Simon is the sole heir of the said Pilot Island, deceased."

It appears that neither of defendants in error testi-
fied in said cause, and the only witness introduced in their
behalf was T. S. Cobb. It will also be remembered that,
while T. S. Cobb had much to do with making the con-
tract between the parties, the deed was taken in the name
of the defendants in error, Wm. Wiseman and James H.
Cobb, who is a brother of T. S. Cobb, and that the ac-
knowledgment was taken before said T. S. Cobb, as no-
tary public.

Polly Simon testified in her own behalf, in substance,
as follows: That she is the mother of Pilot Island and
was well acquainted with his allotment. That he was
about 15 years of age at the time of his death, and died
intestate, without issue. That he died about the year
1906, and she had been living on his allotment since 1901
or 1902, and up until about two years before the trial of
this cause, which was in December, 1912. That the de-
fendants in error had been in possession of said prem-
ises for about two years. She also stated that she had
never sold said land to any one; that she signed a paper
for Cobb; that it was a deed; that Judge Cobb, his wife,
and defendant in error Wiseman were there when it was
signed; that Cobb paid her $15, and Wiseman paid her
nothing. She also testified that Judge Cobb told her to
sign him a deed so he could get the forged deed to Fore-
man off the record; that Judge Cobb stated that he had a
lease on the premises, but could not go out there and

make improvements because Foreman had a forged deed on the land. She also testified that she had made a trade with Foreman to lease him the land, and that when she executed the instrument it turned out to be a deed on the land instead of a lease, and she only intended to make a lease, and understood at the time that it was only a lease on the land. She also testified that her husband, Jackson Simon, directed her to go to Judge Cobb in order to get the deed canceled; that she went to Judge Cobb, and he told her he would take a deed to the land and get the Foreman deed off; that he would do it because he had a lease on the land and could not go ahead with it with the forged deed on it; that he told her to make the lease and he would pay her $15, and when she got a patent for the land, then he would buy it from her, and pay her whatever it was reasonably worth. She said: "Judge Cobb said give him a deed, and he would get the forged deed off, and whenever I get my patent from the government we would come in and agree, and whatever we agreed on that the land was worth he would pay me for it." She testified that Judge Cobb was a practicing attorney at that time, at Wewoka, and that she did whatever he told her to do; that she employed him to look after the forged deed matter for her; that she did not sell the land to him, or to any one else; and that he did not pay her for it.

Jackson Simon testified, in substance, that he was the husband of Polly Simon, and knew the land in controversy; that he had lived on said land until defendants in error took possession of it; that 25 acres were cleared at that time on the creek bottom; that the cleared land was worth $2.50 or $3 per acre rent for the year 1910; and that the uncultivated land was worth $2 per acre rent for that year.

A witness by the name of J. H. Gilmore testified that the cultivated land was worth $2.50 an acre yearly rent. He also testified as to the value of the improvements which the defendants in error had put on the land after they had taken possession, including fencing, clearing, house, well, and barn.

D. O. Jennings, one of the attorneys for plaintiff in error, testified as to the character of the land and stated that in January, 1907, it was worth from $1,500 to $2,000, and that the cleared land was worth $3 an acre yearly rent. He also testified that he would not have bought Seminole land, of which this is a part, at any price in 1911, for he did not at that time consider the title alienable. He stated that he might have given $50 for this tract simply on speculation.

Upon the stipulation and foregoing testimony, the plaintiffs in error rested. Thereupon the defendants in error called T. S. Cobb as a witness, who testified, in substance, that he was acquainted with Wm. Wiseman and James H. Cobb; that James H. Cobb was his brother; that he knew Jackson and Polly Simon; that he was a notary public, and took the acknowledgment, on January 12, 1907, to the deed in controversy, which was executed by Polly Simon and Jackson Simon to Wiseman and James H. Cobb; that he saw them sign said deed. He also testified that he did most of the dealing himself for the purchase of the land; that at the time this trade was made there was really no market value of the land, as the Interior Department disputed the right· of the Seminoles to convey their land, because of no delivery of patents; that the Seminole lands at that time probably had a speculative value; that at the time Polly and Jackson Simon

came to his office they stated that Pilot Island had previously died, and offered to sell this allotment; that he sent James H. Cobb out to look for Wm. Wiseman, and he, himself, went to the courthouse to look up the record on the land; and that he found two deeds from Polly Simon to J. E. Foreman on 80 acres of the land, and a misdescription of another 40 acres. He then talked the deal over with Polly and Jackson Simon, and the contract was consummated. He testified that the contract was, in substance, that he and Wiseman would surrender their lease, which they had on the land in controversy, and would apply what they had paid on the lease on the purchase price of the land; that they had never been in possession under their leases, but that the plaintiffs in error had held possession of said premises. And it was further agreed that a horse which Wiseman had turned over to them should be valued at $100, and that the payments made by Wiseman and witness amounted to $20, making a total of $120, paid on the leases; that this amount should be applied on the purchase price of the land, and the Simons should be paid the sum of $30 in cash, and the further sum of $50 when the patent was delivered; and that they then and there paid to Polly Simon $30 in cash, and the deed was executed. He further testified that the $50 had not been paid, as the patent had not been delivered. He also stated that, at the time of this trade, the Foreman deeds were discussed. He also stated that he told the Simons that in his opinion Polly had only a life estate in the land, and that the remainder would go to her other child, and that for whatever interest she had in the land, taking into consideration the law of inheritance, and the Foreman deeds, she should be paid $200 in the amounts and items above mentioned. He also testi-

fied that the Simons did not employ him as an attorney, and did not come to him for that purpose, so far as he knew, and that he had never represented them nor agreed to represent them ·as their attorney in any matter. He also testified that during his lifetime Pilot Island had made a deed to a part of this land to J. B. Stigall, and that Stigall had deeded it to him, that is, T. S. Cobb, and that he (Cobb) had deeded it to H. H. Howard, and that Howard had deeded it to one Ochiltree.

It will be remembered that this boy Pilot died when he was about 15 years old.

On rebuttal Jackson Simon corroborated the testimony of Polly Simon and flatly contradicted the testimony given by the witness Cobb. Polly Simon was also recalled and contradicted the testimony of Cobb, and further testified that, at the time the deed was made to the defendants in error, nothing was said to her about the estate or interest she had in the land. As stated before, T. S. Cobb was the only witness introduced on behalf of defendants in error. No explanation whatever is made as to why the defendants in error did not testify in their own behalf.

The case was tried to a jury, and verdict returned in favor of the plaintiffs below, who are defendants in error herein.

No exceptions were taken to the instructions, and the only question reserved for the determination of this court is whether, upon consideration of the entire record, the verdict is supported by the evidence. We are not unmindful of the rule that a verdict of a jury should not be set aside upon conflicting testimony, nor where there is evidence reasonably tending to support it. That is the

general rule, and a wholesome and proper one, too; but we must not overlook that other equally just and proper rule that it is the duty of the appellate court to set aside a verdict, where it is manifest that an injustice has been done.

We cannot overlook the fact that the plaintiffs in error in this case are poor, uneducated, illiterate, ignorant freedmen—negroes—in destitute circumstances. Probably the most ignorant, destitute, and helpless wards of this government; born in the lowest degree of seclusion and destitution, raised in the most extreme and pinching poverty, with no idea of the value of property, and no experience whatever in business transactions. Dependent absolutely and entirely upon the care and protection of, their superiors, and the kind and ever gentle, but sometimes sparing, hand of Providence; just such unfortunate creatures as should have had the care and protection of the other parties to this action, who seem to have been possessed of a more than average degree of shrewdness and ability to protect themselves in the scramble for worldly goods.

We are reminded of the fact that the only witness who testified on behalf of defendants in error, and who was one of the principal actors in this questionable transaction, had been dealing in the pretended title of the deceased boy's land—conveyed by him when he was only 15 years of age. The evidence shows that this ignorant, destitute mother of this dead boy, in the very midst of her agonizing grief, attempted to borrow money on her land, by leasing it, to obtain money to bury her dead child, and, instead of making a lease, she was inveigled in her ignorance and excruciating sorrow into executing a deed for the

land inherited from her boy, whose body was still warm with the life and love given him by his lowly but destitute mother, black and ignorant though she may have been. When she discovered that the leases which she had given to secure money to bury her child had turned up as a deed to the land, she went again to the office of a lawyer for protection, and there related her troubles to one whom she had a right to rely upon for help and protection. We do not care to discuss here the question of the conflict of the testimony, but we cannot pass without saying that, under the evidence as given by the plaintiffs in error, it was the duty of the defendants, and they owed it to themselves, as lawyers and business men of good standing, as we presume they are, to take the witness stand, and explain why they were parties to an attempt to obtain title to this woman's land for a horse valued at $100, and $15, or possibly $20, in cash, and an indefinite, uncertain, unsecured, written promise to pay $50 more at some uncertain, indefinite time, in the dim distant future, when the evidence showed that the land was worth $1,500 or $2,000 at the time of the transaction, and $3,000 to $3,500 at the time of the trial of this case. Why did they not at least attempt to show some good faith on their part?

The evidence not only shows that there was an inadequacy of consideration, but practically no consideration for this land. Fifteen dollars and a horse, formerly sold or traded to plaintiffs, and which practically already belonged to them—for a tract of land worth $2,000. The evidence that defendants in error took possession of the land as charged by plaintiffs in error, and placed, or claim to have placed, improvements on it after this case had been commenced, looks bad on its face, and it is at least a badge of fraud.

As stated in *Bruner v. Cobb*, 37 Okla. 228, 131 Pac. 165:

"Ordinarily mere inadequacy of consideration is not sufficient ground, in itself, to justify a court in canceling a deed, yet when the inadequacy is so gross as to amount to fraud, or, in the absence of other circumstances, to shock the conscience, and furnish satisfactory and decisive evidence of fraud, it will be sufficient ground for canceling a conveyance or contract, either executed or executory; the rule being based upon the theory that fraud, and not inadequacy of price, is the sole reason for the interposition of equity."

After a full and complete investigation of this case, we are forced to say that we cannot give our consent to the approval of the verdict of the jury in this case. Manifestly, an injustice has been done. The overpowering intellects and well-known ability of the defendants in error, with the able assistance of the only witness in the case, was evidently too strong for the untutored minds of plaintiffs in error. The language used in *Stone v. Moody*, 41 Wash. 680, 84 Pac. 617, 85 Pac. 346, 5 L. R. A. (N. S.) 799, is well in point, and is as follows:

"It is well known that many good people, and people of average or greater intelligence, are sometimes duped and misled by the skill, cleverness, and artifices of those who are adepts in the matter of deceiving their fellow men; and courts should not throw about schemers of this kind a protection that will tend to encourage the practice of their arts."

The government of the United States has been extremely generous in its efforts to provide for its unfortunate and dependent wards in the Indian Territory, and seemed to take every precaution to protect them from the rapacious schemes of their more intelligent neighbors;

but, in spite of all that, a few designing, evil-minded schemers have diligently plied their artifices in every conceivable manner to defraud these ignorant, helpless people out of their lands. They naturally turn to men of our profession for protection. It is the duty of the lawyer to use every honorable means to assist them in such cases, and it does not look well, and is certainly not to the credit of the profession, for a lawyer to take advantage of their condition, or even enter into contracts with them at such times, for the purchase of their property. They should be above and stand aloof from it. In transactions of this nature, every presumption should be against the lawyer, and, where there is a question as to the interpretation of such contracts, that construction which tends most strongly against the lawyer in the deal should be given. Beyond all this, it appears to us that the admitted consideration paid for this land was so manifestly inadequate as to justify an inference of fraud; and, when taken into consideration with all the other facts, we are forced to the conclusion that the case should be reversed. This, we believe, is in full accord with the doctrine laid down in *Bruner v. Cobb, supra,* wherein it is said:

"Whenever it appears that the parties to a trade have knowingly and deliberately fixed upon any price, however great, or however small, there is no occasion nor reason for interference by courts, for owners have a right to sell property for what they please; but where there is no evidence of such knowledge, intention, or deliberation by the parties, the disproportion between the value of the subject-matter and the price may be so great as to warrant the court in inferring therefrom the fact of fraud."

And such we find to be the clear inference in this case.

The judgment should be reversed and remanded, with instructions to the district court of Seminole county to cancel and set aside the deed from Polly Simon and Jackson Simon to Wm. Wiseman and James H. Cobb, dated January 12, 1907, for the west half of the southeast quarter and the southeast quarter of the southeast quarter of section 24, township 9, range 7 east, I. M., and that the same be forever canceled of record, and that upon demand a writ of possession issue from said court, placing Polly Simon in possession of said premises.

By the Court: It is so ordered.