## CLAYTON et al. v. OBERLANDER et al.

No. 6459—Opinion Filed May 23. 1916.
(157 Pac. 929.)

1. **Deeds—Validity—Evidence—Sufficiency.**

In an action to cancel a deed, brought by the personal representative and heirs of a decedent, where the evidence discloses that the grantor had long been confined to her room by an illness which proved fatal six days after the execution of the deed, and the grantees, her brother, and a niece, are shown to have been disposed to influence the grantor against her heirs apparent and the deed appears to have been executed in consideration of a contract which was illusory and ineffective, and not as a gift, fraud and undue influence may be deduced from slight circumstances.

2. **Appeal and Error—Review—Questions of Fact—Equitable Causes.**

In a case of purely equitable cognizance, this court will review the entire record and, if it appears that the judgment of the court below is contrary to, the weight of the evidence, reverse the cause and render, or cause to be rendered, such judgment as should have been entered at the trial.

3. **Deeds—Validity—Evidence—Weight and Sufficiency.**

Upon a careful examination of the record. the judgment of the court below is **held** to be contrary to the weight of the evidence.

(Syllabus by Rummons, C.)

Error from District Court, Major County; James W. Steen, Judge.

Action by Ralph S. Clayton, as administrator of the estate of Henrietta Oberlander, deceased, and others against Nora M. Oberlander, administratrix of the estate of S. B. Oberlander, deceased, and another. Judgment for defendants, and plaintiffs bring error. Reversed, with directions.

This action was commenced in the district court of Major county by Ralph S. Clayton, as administrator of the estate of Henrietta Oberlander, deceased, Ralph S. Clayton, Mabelle H. Clayton, and Vera M. Clayton, an infant, by her next friend, Ralph S. Clayton, hereinafter styled the plaintiffs, against S. B. Oberlander and Viola M. Curtis, hereinafter styled the defendants, to cancel a deed executed by Henrietta Oberlander conveying certain real estate in Major county to the defendants. After the trial in the court below S. B. Oberlander died and the action was re-vived against Nora M. Oberlander, the administratrix of his estate. The defendants had judgment, and plaintiffs prosecute this proceeding in error to reverse the same.

The evidence in this case is very voluminous and hopelessly in conflict. The undisputed facts are that the deceased, Henrietta Oberlander, removed from her home in Iowa to Major county in 1910. Luetta Clayton, now deceased, the mother of the plaintiffs, was the only living child of Henrietta Oberlander. The plaintiffs are her only surviving children, and the only heirs at law of Henrietta Oberlander. Henrietta Oberlander purchased and traded for the real estate here in controversy. It appears that some real estate belonging to Luetta Clayton was traded in as part of the purchase price of one piece of real estate embraced in the deed sought to be canceled, and that title to the same was taken in the name of Henrietta Oberlander. Mabelle Clayton, one of the plaintiffs, came from Iowa with her grandmother, who was a widow, and lived with her in the town of Cleo upon their arrival in Oklahoma. Luetta Clayton and her husband, John Clayton, with their children, Ralph S. Clayton and Vera M. Clayton, at that time lived on a farm near Cleo. In 1911 Henrietta Oberlander became afflicted with dropsy and suffered a stroke of paralysis, depriving her of the use of her limbs upon the right side. After she became afflicted Luetta Clayton and her family moved to Cleo and lived with her and cared for her in her illness until the death of Luetta Clayton in 1912. Thereafter the plaintiffs and their father continued to live with Henrietta Oberlander and care for her with the aid of servants until September 1, 1912.

S. B. Oberlander was the brother of Henrietta Oberlander, and had lived at Cleo for a long time prior to the removal thereto of his sister. Viola Curtis, the other defendant, was his daughter and the niece of Henrietta Oberlander. About September 1, 1912, the plaintiffs and their father moved from the residence of Henrietta Oberlander to another dwelling in Cleo, and Viola lived with Mrs. Oberlander and took care of her with the aid of servants from that time until her death, which occurred on September 17, 1912. At the time of her death she was about 67 years old.

On September 11, 1912, Henrietta Oberlander executed the deed in controversy conveying the real estate, consisting of a farm and town property in Cleo, to S. B. Oberlander and Viola Curtis. This deed recites that the consideration therefor was the sum of $1 "and the further consideration of the affection I bear my brother, S. B. Oberlander,

and my niece, Viola M. Curtis, and for these considerations heretofore mentioned and for other valuable considerations." At the same time Viola Curtis executed a contract to Henrietta Oberlander, of which the following is a copy:

## "Contract.

"This agreement made this 11th day of September, 1912, between Henrietta Oberlander and Viola M. Curtis, her niece, parties of the first and second parts:

"First. The said Viola M. Curtis agrees to take care of her said aunt, Henrietta Oberlander, in her sickness to watch over and care for her, and supply all the medicines necessary, and all the necessaries of life, and to nurse and care for her, and in the absence of the said Viola M. Curtis she will furnish a trusty and competent nurse and attendant, that will use the utmost care in making her as comfortable as she can be made under the circumstances.

"Second. That the said Viola M. Curtis will settle all the claims and pay all the debts which the said Henrietta Oberlander has contracted or may contract.

"Third. That she will look after all the properties and possessions and take the best kind of care of all premises that may be left in her care, and render a just account of all her doings in the premises.

"Fourth. In the event that said Henrietta Oberlander shall depart this life, she will furnish suitable burial apparel, and will secure a good lot in the cemetery and cause to be erected a suitable tombstone, and keep said grave and surroundings in very best of order and repair.

"Fifth. And the said Viola M. Curtis further agrees that she will do and perform the same things for Luetta Clayton, the daughter of the said Henrietta Oberlander, whose remains now rest in the cemetery near Cleo, such as keeping the ground clear, and erecting a suitable tombstone for the said Luetta Clayton.

"Sixth. That in the event that the said Henrietta Oberlander should recover her health and desires that whatever property that remains in the hands of Viola M. Curtis shall be conveyed back to her, it is agreed that the same shall be done, after the payment in full of all the expenses that are now contracted, or may be contracted in the future. Then in that event whatever property may remain will by the said Viola M. Curtis be turned over to the said Henrietta Oberlander.

"Seventh. It is expressly agreed between said parties that the charges of Viola M. Curtis, in and about all the matters and things that she may perform for the said Henrietta Oberlander, shall be left exclusively to her own judgment. without any contradiction from any source whatever.

"In witness whereof I, Viola M. Curtis, have hereunto set my hand this 12th day of September, 1912.

"[Signed] James L. Hughey,
"Notary Public [L. S.]
"My com. expires Aug. 27th."

It seems that this real estate was the only property of which Henrietta Oberlander was possessed. She had at the time of her arrival in Oklahoma been the owner of a note for $3,000, secured by a real estate mortgage, but this note and mortgage had been indorsed and assigned to Luetta Clayton during her lifetime. It also seems from the evidence that she was at the time of her death considerably indebted for medical services, drugs, and other necessities. Beyond the facts above stated, and the further fact that, from the time she was stricken until her death, Henrietta Oberlander's condition continued to grow gradually worse, and at the time the events here in controversy occurred she was in a deplorable physical condition, the evidence offered by plaintiffs and defendants is in absolute conflict. It is contended by plaintiffs, and they offered evidence in support thereof, that at the time of the execution of the deed in controversy Henrietta Oberlander, because of her long illness, had become mentally incompetent, and was lacking in sufficient mental capacity and understanding to execute the deed relied upon by the defendants. They further offered evidence to show that they were persuaded by the defendant Viola Curtis to leave the residence of their grandmother on September 1st, for the purpose of taking a short rest while Viola Curtis relieved them in caring for Henrietta Oberlander; and they allege, and offer some evidence to prove, that after they left the home of their grandmother and Viola Curtis took charge, she and her father exercised undue influence over Henrietta Overlander, and that the deed was the result of the undue influence so exercised. They also charge that the deed was procured by fraud and by duress. The evidence shows that Henrietta Oberlander attempted to sign her name to the deed, but was unable to control the pen, and that Viola Curtis held her wrist and steadied her hand while she signed her name thereto; and it is urged by plaintiff that this did not constitute a signature as contemplated by law. The evidence of plaintiffs tends to show that Henrietta Oberlander felt a great affection for the plaintiffs, her grandchildren, and for their father, and for her deceased daughter, Luetta Clayton, and that she continued to express and exhibit this affection up to the time of her death. She had before leaving Iowa made a will devising and bequeathing her property first to

her husband, and, in the event of his death before her demise, to her daughter, Luetta Clayton, and, in the event of her death before that of the testatrix, to these plaintiffs. The evidence of plaintiffs tends to show that before the coming of Henrietta Oberlander to Oklahoma communication between her and her brother S. B. Oberlander, had been infrequent, and that after she came to live at Cleo, where her brother resided, there were only casual visits between them; but the evidence further discloses that, in the fall of the same year Henrietta Oberlander was taken ill. S. B. Oberlander was also stricken with paralysis and could only get about with extreme difficulty.

The evidence for the defendants tended to show that after the death of their mother, Luetta Clayton, the plaintiffs gradually became indifferent to their grandmother, and neglected to give her proper care and attention, that Henrietta Oberlander had on deposit in a bank in Cleo a considerable sum of money, and that she gave Ralph S. Clayton power of attorney to check against this account, and that considerable sums of money were drawn out by checks payable to his sister and to his father, and that about the first of September, 1912, this account was exhausted. Defendants' evidence further tends to show that Henrietta Oberlander, being at the end of her resources in ready money, told the plaintiffs and their father that they would have to move out, and that pursuant to her commands they did move, about September 1st. Viola Curtis denied having suggested that the Claytons move out to take a rest. The evidence of defendants further tends to show that after plaintiffs moved, Viola Curtis took charge of her aunt, and ministered to her with great care and affection. It also appears that Viola Curtis' home was in another town and that she was in Cleo, on the occasion in question, because of the absence from home of her husband. Defendants also offered evidence to rebut the evidence of plaintiffs as to the mental incapacity of Henrietta Oberlander. The defendants' evidence tended to show the deed and contract were prepared at the suggestion of Henrietta Oberlander and that she had announced, prior to the removal of the Claytons, that she intended to give her real estate to her brother and Viola Curtis. Plaintiffs offered evidence tending to impeach the evidence of the principal witness for the defendants, the servant who was in Henrietta Oberlander's employ at the time of her death and for some time prior thereto, by showing contradictory statements made by her to other witnesses. Other facts bearing upon the case will be commented upon in the opinion.

Parker & Simons and Brady & Willis, for plaintiffs in error.

Jno. V. Roberts, M. C. Garber, and E. W. Snoddy, for defendants in error.

Opinion by RUMMONS, C. (after stating the facts as above). This being a case of purely equitable cognizance, we are required to review the evidence and consider the same in order to determine whether or not the assignment of error presented by the plaintiffs, that the decree of the court below is contrary to the weight of the evidence, is well taken. From the evidence offered by the plaintiffs, if true, there can be no question that a gross fraud was perpetrated upon the dying Mrs. Oberlander, and her unsuspecting grandchildren. On the other hand if the evidence offered by the defendants be true, the grandchildren were guilty of ingratitude to the grandmother sufficient to have estranged themselves from her affections, and warrant her in depriving them of her property. The difficulty we have is in determining from the mass of the testimony upon which side lies the truth. The state of the evidence as to the mental capacity of Henrietta Oberlander at the time she executed the deed in controversy, if that were the sole fact to be considered, would not warrant us in holding that the decree of the court was contrary to the weight of the evidence. But the evidence as to her physical condition and her state of mind is to be considered in determining whether or not the execution of this deed was procured by fraud and undue influence.

We think that two facts stand out with distinctness from the mass of the record which go a good long way in determining this question. The defendants set out in their brief the evidence of Mrs. S. A. Crossman, a witness for the plaintiffs. This testimony is as follows:

"Q. Were you there at any time when the defendant S. B. Oberlander was there? A. One time and only one. Q. When was that? A. I think it was some time in August of the year she died. Q. Were you present in the room with him and her? A. Yes, sir. Q. Did you hear any statements made by him in her presence and to her? A. I heard a very severe conversation. Q. Describe what took place there; what was said by him and her and by you, if anything; describe that circumstance. A. Well, I didn't know that he was there, or I should not have gone, but I was at my daughter's, and I ran over to see her, and he sat there, and seemed to be a surprise to him, and he told her that she was not having the care she ought to have. She said, 'Oh, yes; they are taking as good care of me as

they can;' he says, 'They are not, no such a thing; I would kick the Claytons out; I would not have them around me;' and she looked up at me—she was very feeble—and said, 'Mrs. Crossman, if you were here all the time, you would know what a terrible trial it is to take care of me,' and I told her I realized it; he said, 'You are too generous; you ought to kick the Claytons out and get somebody here to take care of you.' Q. Where were you? A. I sat right by her side and was holding her hand. Q. In what tone of voice did Mr. Oberlander speak when he was making these statements? A, Very gruff. Q. About how long was this before she died? A. I cannot tell you; I think it was some time in August. Q. Before she died in September? A. Yes, sir. Q. How long did you remain there? A. Well, not long; I started to go away and she held to my hand. He said, 'he had tried all summer to get to talk to her privately, but he never could, and now he was going to speak right out in meeting;' and I took that as a hint to go, but she hung to my hand and I sat there a few minutes, and I asked her if she had had the doctor to-day; she said, 'No; the doctor said there was no use of him coming any more.' He says, 'that is the way of it; you are not having any care at all;' she said, 'The doctors said they could not do me any good;' and he asked if she had any whisky. She said, 'No; I cannot take it, it goes to my heart,' and he said he would get her some and I afterwards heard he did."

We have carefully examined the testimony of S. B. Oberlander at the trial, and the occurring of this conversation is not denied by him, nor was he asked concerning it. The evidence of this witness, being undenied, persuades us that S. B. Oberlander was endeavoring to convince his sister that the Claytons were neglecting her and not giving her proper care, and that she had been too generous with them, and had done enough for them, and that she ought to cast them adrift. This shows the state of mind of one of the defendants towards the plaintiffs, and indicates to us that he thought the Claytons ought to be cut off, and that the time had come for him to say so. The other fact that stands out is the contract by Viola M. Curtis, hereinbefore set out. The evidence shows that this contract was drawn at the same time as the deed, and that they were executed practically contemporaneously, and that both were intrusted to the keeping of Viola Curtis. If it were not for this contract and the bit of evidence above quoted we would find great difficulty in persuading ourselves that the decree of the trial court was contrary to the weight of the evidence. In considering the weight this contract ought to have in the determination of this case we must take into consideration the relative conditions of the parties to this transaction. Henrietta Oberlander had been helpless and confined to her bed or her chair for more than a year. Her relatives, friends, and acquaintances had given up all hope of her recovery and looked for her early death. On the other hand there is evidence tending to show, and our knowledge of human nature leads us to believe. that she had some hopes of recovery, and of continued life. Her illness had made great inroads upon her physical strength, and while it may not have resulted in such mental incapacity as to cause her to be unable to execute a contract, yet the evidence shows that it impaired her mental vigor.

In this view of the state of the contracting parties let us consider this contract. By the terms of it, Viola M. Curtis agreed to take care of her aunt in her sickness, furnish her with all medicines, and all the necessities of life, nurse and care for her, and in her absence to furnish a trusty and competent nurse and attendant; that she will settle all the claims and pay all the indebtedness which Henrietta Oberlander has contracted or may contract; that she will look after all the properties and possessions and take the best kind of care of the premises that may be left in her care, and render a just account of all her doings in the premises; in the event of her aunt's death she will cause a suitable burial of her remains, see that her grave is kept in proper order; that she will do the same things for Luetta Clayton, the deceased daughter of the said Henrietta Oberlander; that in the event said Henrietta Oberlander should recover her health and desire that whatever property remains in the hands of Viola M. Curtis shall be reconveyed to her, it is agreed that the same shall be done. after the payment in full of all the expenses that are now contracted or may be contracted in the future, then in that event whatever property may remain will by the said Viola M. Curtis be turned over to the said Henrietta Oberlander; that Viola M. Curtis shall be the sole judge of the charges to which she has been put without contradiction from any source. It will be remembered that at the time Viola Curtis executed this contract Henrietta Oberlander had conveyed all her property not to Viola Curtis, but to S. B. Oberlander and Viola Curtis. so that there was no property or possessions of Henrietta Oberlander for Viola M. Curtis to take charge of, manage, and account for. It will be noted this contract does not refer at all to the deed that day made by Henrietta Oberlander. S. B. Oberlander was not a party to this contract, and was not bound thereby. In the event Henrietta Oberlander had recovered she could not have enforced the reconveyance of this property by S. B. Oberlander, even if she had paid all expenses incurred by Viola M. Curtis,

under the terms of said contract. There is no evidence as to the financial ability of Viola Curtis to carry out and perform the matters she had promised to perform. The evidence shows that the burial expenses of Henrietta Oberlander were paid, but it does not appear anywhere that other of her debts have ever been paid, In fact from the statements in the brief of defendants it appears that they have not been paid. It seems to us that this speciously drawn contract was placed as an inducement to Henrietta Oberlander for a conveyance of her property, that she hoped to recover, and that she had been led to believe by her brother that her grandchildren, the Claytons, had neglected her, and that at the hands of Viola Curtis she would receive proper care and attention. We are convinced that had Henrietta Oberlander lived and commenced action to cancel the conveyance made by her in consideration of the contract above quoted, she would have had no difficulty in having a cancellation decreed. This conveyance does not stand upon the footing of a gift for the reason that the grantor was led to believe that she was receiving something of value in return therefor, and that she might ultimately, if she so desired, reclaim her property. In that case when the respective situations and the relationship of the parties are taken into consideration, and when it appears that the purported consideration for the conveyance was illusory and sham, the conveyance cannot stand. Where there is a total failure or such gross inadequacy of consideration as to shock the conscience of the chancellor, a court of equity will give weight to slight circumstances tending to show fraud, undue influence, or oppression, in order to set aside a conveyance made under such circumstances. Hogan v. Leeper, 37 Okla. 655, 133 Pac. 190, 47 L. R. A. (N. S.) 475; In re Spann, 51 Okla. 309, 152 Pac. 68; Barker v. Wiseman, 51 Okla. 645, 151 Pac. 1047.

We think the learned court in the trial of this case did not give sufficient weight to the circumstances surrounding the execution of this deed and this contract. This contract, to our minds, robs the evidence of the defendants, as to the changed feelings of Henrietta Oberlander for her grandchildren and as to her love and affection for her brother end niece, of all its effect. This contract shows that the deed in controversy was not a gift made by Mrs. Oberlander to her brother and niece with the knowledge of impending death. It shows that it was made for a purported consideration with an expectation that she might recover, and might reclaim her property.

We therefore conclude that the weight of the evidence shows that the deed in controversy was procured by fraud and misrepresentation by parties of whom the utmost good faith and fair dealing were required. It should therefore have been set aside.

This cause should be reversed, with directions to the court below to cancel, set aside, and hold for naught the deed described in the petition of plaintiffs.

By the Court: It is so ordered.